## AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT

I, Gregory Ellis Newman, being first duly sworn, state as follows:

### Introduction and Agent Background

1.      I am a Special Agent with the Diplomatic Security Service (DSS), an agency

within the U.S. Department of State.  I have been in this position since June 2014.   In that

capacity, I primarily investigate violations of federal statutes concerning visa and passport fraud.

I am presently assigned to the Criminal Fraud Investigations unit of DSS as a criminal

investigator.  As a federal agent, I am authorized to investigate violations of laws of the United

States, and as a law enforcement officer I am authorized to execute warrants issued under the

authority of the United States.

2.      Prior to joining DSS, I served with the Metropolitan Police Department in

Washington, D.C., for two years.  I have received specialized training in law enforcement and

criminal law from the Federal Law Enforcement Training Center in Glynco, Georgia, and the

Metropolitan Police Academy in Washington, D.C.  I have conducted numerous investigations

into various types of criminal violations, including travel document and immigration fraud,

financial fraud, assaults and bodily injuries, property crimes, firearms offenses, and narcotics

offenses.

3.      This affidavit is submitted in support of a criminal complaint alleging that

DEFENDANT 1, HAITHAM SAAD, and DEFENDANT 3 ("defendants"), and others,

conspired to commit an offense against the United States, that is, theft of U.S. Government

property, 18 U.S.C. § 641, and to defraud the United States, in violation of 18 U.S.C. § 371.

4.      This affidavit is based on my personal knowledge, information provided to me by

other law enforcement agents, law enforcement records, search warrant returns, witness

interviews, and my training and experience, as well as on the training and experience of other law enforcement agents.

5.      Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that the defendants violated 18 U.S.C. § 371.

6.      Quotations from electronic communications in this affidavit are as they appeared when they were sent or received, including typographical, grammatical, and other errors. Translations from Arabic to English are accurate to the best of my knowledge.

## Summary of Probable Cause

7.      Applications for refugee resettlement in the United States are processed and adjudicated under the U.S. Refugee Admissions Program (USRAP), an interagency program involving, among other federal agencies, the Department of State and Department of Homeland Security (DHS).  Cases under the USRAP are tracked within the Worldwide Refugee Admissions Processing System (WRAPS), a State Department database containing sensitive but unclassified records and information.  During different periods of time, SAAD and DEFENDANT 3 were employed abroad by the U.S. Government and were able to access WRAPS as part of their job responsibilities.

8.      Beginning at least in or about February 2016, and continuing until at least in or about April 2019, in the Hashemite Kingdom of Jordan, the Russian Federation, and elsewhere, the defendants knowingly and intentionally conspired to steal U.S. Government property—that is, sensitive but unclassified U.S. Government records and information contained in WRAPS. *See* 18 U.S.C. §§ 371, 641.  The conspiracy focused on applications seeking resettlement under a

2

particular U.S. program, known as the P-2 Direct Access Program for U.S.-Affiliated Iraqis ("Iraq P-2 program"), which was designed primarily to assist refugees from the Republic of Iraq who had worked for the U.S. Government or its contractors.  The defendants carried out this conspiracy by, among other things, accessing WRAPS without authorization, downloading and taking screenshots of records and information in the system, and transmitting the stolen records and information to persons unauthorized to receive them.

       9.     In so doing, the defendants also conspired to defraud the United States, that is, they conspired to impair or obstruct a lawful government function using deceptive and dishonest means.  As explained in more detail below, it is a lawful government function of the State Department and DHS, among other agencies, to administer the USRAP and the Iraq P-2 program.  Moreover, it is a lawful government function of those agencies, in order to maintain the integrity of the USRAP and Iraq P-2 program, to ensure that the sensitive U.S. Government records and information at issue in this investigation—that is, records and information in WRAPS that were targeted for theft by the defendants—are kept confidential, non-public, and not available to unauthorized persons.  Through deceptive and dishonest means—including unauthorized access to and use of WRAPS—the defendants conspired to impair and obstruct the USRAP, the Iraq P-2 Program, and the confidentiality of those records and information.

       10.    The conspiracy was directed by DEFENDANT 1, and evidence gathered as part of this investigation indicates that DEFENDANT 1 likely used the stolen records and information to assist applicants seeking resettlement under the Iraq P-2 program.  This conclusion is corroborated by evidence that DEFENDANT 1 provided applicants with employment verifications stating that applicants had worked for U.S. contractors in Iraq.

## U.S. Refugee Admissions Program (USRAP)

11.      A refugee is defined under U.S. law as a person who is outside his or her country of origin and is unable or unwilling to return because of past persecution or a well-founded fear of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group.

12.      The USRAP was created by the Executive Branch and authorized by Congress to facilitate the admission and resettlement of refugees in the United States.  At all times material to this affidavit—that is, beginning at least in or about February 2016 and continuing until at least in or about April 2019—applications to the United States for refugee resettlement were processed through the USRAP, which was overseen by the U.S. State Department's Bureau of Population, Refugees, and Migration (PRM), in cooperation with U.S. Citizenship and Immigration Services (USCIS), a component of DHS.  The U.S. Department of Health and Human Services (HHS), through its Office of Refugee Resettlement, also played a role in the USRAP by assisting and providing resources to resettled refugees.

13.      As a general matter, eligible refugee applicants fell within one of three broad categories, referred to as "priorities."  Priority 1 (P-1) included, among others individuals, those referred from the United Nations High Commissioner for Refugees; Priority 2 (P-2) covered groups of special humanitarian concern, often based on a group's ethnic, religious, or national identity; and Priority 3 (P-3) referred to applications for the purpose of family reunification.

14.      The Refugee Crisis in Iraq Act, signed into law in 2008, created a P-2 program of the USRAP, the Iraq P-2 program, which allowed certain Iraqis to apply directly to the USRAP for resettlement in the United States.  Eligible applicants included Iraqis who:  worked as interpreters or translators for the U.S. Government or multinational forces; worked for the U.S.

Government, its contractors, or grantees in Iraq; worked for U.S.-based media or nongovernmental organizations; or were a close relative of an eligible applicant.

15.     With some exceptions, refugee applications to the USRAP, including the Iraq P-2 program, were initiated at one of several Resettlement Support Centers (RSCs), which were run by international or nongovernmental organizations located abroad and working pursuant to a contract with the State Department to process applications in specific geographic regions.  RSCs were responsible for, among other things, the initial processing of applications and screening of applicants for eligibility under the USRAP.

16.     The RSC Middle East and North Africa (MENA) was based in Amman, Jordan, and operated by the International Organization for Migration (IOM) under a contract with the State Department.  Processing of applications under the Iraq P-2 program was available at the RSC MENA, among other locations in the Middle East and North Africa.  The RSC Eurasia was based in Moscow, Russia, and also run by IOM under a contract with the State Department.

17.     USCIS was responsible for security checks and adjudication of all refugee applications.  The vetting of applicants included biographic and biometric checks against an array of immigration, law enforcement, and U.S. Intelligence Community (USIC) databases, as well as mandatory, in-person applicant interviews.  Often, USCIS's initial assessment of an application and applicant would trigger additional investigation, security checks, and interviews.

18.     To fulfill its responsibilities under the USRAP, USCIS maintained field offices located within U.S. embassies, including those in Amman and Moscow.  Within those field offices, USCIS, like many U.S. Government agencies operating abroad, commonly employed foreign nationals, known as "foreign service nationals" (FSNs) or "locally engaged staff" (LES).

19.     USCIS staff at international field offices were typically responsible for assisting with the processing and adjudication of refugee applications within their own geographic region. Occasionally, when there was a high volume of refugee applications in a particular region, USCIS staff, including FSNs/LES, would participate in a "circuit ride," in which the staff would travel to a region on a temporary basis to provide assistance.

20.     In or about 2018, USCIS began a phased effort to close its international field offices, consolidating USCIS international operations to offices within the United States.  The USCIS field office in Moscow, for example, was closed to the public on or about February 28, 2019, and it closed permanently on or about March 29, 2019.

## Worldwide Refugee Admissions Processing System (WRAPS)

### *Records and Information in WRAPS and Limitations on Use*

21.     USRAP applications, or "cases," were tracked in WRAPS, which was managed by the Refugee Processing Center (RPC), a component of PRM located in the United States. WRAPS connected the multiple U.S. Government agencies and other entities comprising the USRAP, and it served as the information management system for the refugee application, adjudication, and resettlement process.  Access to WRAPS was limited to authorized personnel, which included certain USCIS employees, including certain FSN/LES employees located at field offices abroad.

22.     For each USRAP case, WRAPS contained substantial information that was treated as confidential, including: personal identifying information of applicants and their family members; applicants' employment history, prior military service, and their accounts of persecution or fear of persecution; the results of security checks; questions and answers from USCIS interviews and proposed questions for future interviews; analyses of applicants' USRAP

eligibility; and assessments of applicants' credibility and any potential threat they posed to U.S. public safety or national security.  In addition to data that was entered into WRAPS, the system also allowed users to upload and download documents, such as refugee applications, employment verifications, and USCIS interview outlines.

23.     WRAPS records were tracked by case numbers, which included a prefix reflecting the location in which the case was initiated (and not the country of origin of the applicant).  For example, cases originating at the RSC in Jordan, regardless of the applicant's nationality, would have a case number such as "JO-12345," with the "JO" indicating that the application was initiated in Jordan.  Other abbreviations included IZ for Iraq and EG for Egypt.  To anonymize WRAPS case numbers in this affidavit, individual case numbers are uniquely identified as "Case 1," "Case 2," and so on.  All cases referenced in this affidavit include a JO, IZ, or EG prefix.

24.     WRAPS was governed by "Rules of Behavior," which users were required to read, understand, and sign, and which made clear that, among other things, WRAPS was "strictly for the purpose of refugee processing to support the [USRAP] only"; users "must never attempt to access information [they] are not authorized to access, which is not necessary for [them] to perform [their] job, or which is inappropriate or unnecessary to access"; and users "must never make a copy of sensitive information on a screen by taking a picture of it, capturing a screenshot, recording a video, or similar activities unless the image will remain on the WRAPS system and be stored in an appropriate location with access control."  In addition, every time a WRAPS user logged into the system, they were required to acknowledge that they were accessing a U.S. Government database containing sensitive information and that "WRAPS is strictly for the purpose of refugee processing to support the U.S. Refugee Admissions Program."

*WRAPS I and WRAPS II*

25.     The current version of WRAPS, known as "WRAPS II," was introduced in or around 2013, and it replaced an earlier, original version, known as "WRAPS I."  WRAPS I remained operational, however, and, at least until in or about 2019, a user could access WRAPS I through a particular URL and could view or download the same information available in WRAPS II.  If a user of WRAPS I needed to reset their password, however, the user would need to do that within WRAPS II.

26.     In contrast to WRAPS I, WRAPS II included an updated interface that displayed the name of the user who was logged into the system at that time; the WRAPS I display did not contain that information.   Thus, a screenshot of the WRAPS II interface would capture the name of the user that is displayed on the screen, while a screenshot of WRAPS I would not.  In addition, WRAPS II contained certain audit features that allowed for administrators to see when users had logged in or out of the system or had reset their password.

27.     In or around June 2019, in the course of this investigation, the RPC created a new audit feature that allowed administrators to identify, retrospectively, which cases and files a user had accessed in WRAPS I or WRAPS II, and when the user had accessed them.  This feature was limited, however, in that it only provided information going back to on or about May 30, 2016.

*The Importance of Confidentiality of WRAPS Records and Information*

28.     In administering the USRAP, it was critically important that the State Department, DHS, and other agencies and employees involved in the USRAP ensure that sensitive U.S. Government records and information—including the records and information sought by the defendants—be kept confidential, non-public, and not available to unauthorized persons.  This confidentiality permitted the agencies to administer the program fairly and lawfully, to protect the United States from threats to public safety and the national security, and,

consistent with U.S. and international law, to assist foreign persons fleeing persecution, including by resettling them in the United States.

29.     The theft or receipt of sensitive records or information in WRAPS by unauthorized persons creates a number of risks.  For example, if an applicant is provided confidential records or information from WRAPS regarding their own case—such as security check results, interview questions, or internal assessments of an applicant's credibility—that applicant could use the records or information to their advantage and potentially secure admission to the United States through the USRAP when that would not otherwise have occurred.  Such fraud increases the risk to public safety and national security of the United States.  Furthermore, because the number of refugee admissions to the United States are annually capped by the President in consultation with Congress, such an outcome would also likely preclude the admission of qualified refugee applicants who would otherwise be resettled in the United States.

## Defendants

30.     DEFENDANT 1 was a citizen of Iraq who has lived in Jordan since in or around 2010.  DEFENDANT 1 previously applied for refugee resettlement in the United States, but his application was denied.  Evidence gathered through this investigation, including records showing DEFENDANT 1's electronic communications, demonstrates that DEFENDANT 1 directed his co-conspirators to steal WRAPS records and information, typically regarding Iraqi nationals applying through the Iraq P-2 program.

31.     SAAD was a citizen and resident of Jordan.  From in or around November 2007 until in or around January 2016, he was employed by USCIS as an FSN/LES, serving as an

Immigration Assistant at the U.S. Embassy in Amman.  As part of his duties, SAAD had access to WRAPS.

32.     Although SAAD's USCIS employment was terminated in January 2016, he maintained the ability to access WRAPS remotely for several months—likely aided by DEFENDANT 3—and he did so even though he was no longer employed by the U.S. Government and was therefore unauthorized to access the system.  The evidence demonstrates that SAAD worked directly with DEFENDANT 1, and, in attempting to recruit a potential co-conspirator in 2019, SAAD indicated that he had worked to obtain records and information from WRAPS as part of the scheme for "maybe around eight years."

33.     DEFENDANT 3 was a Russian citizen living in Moscow.  From August 2011 until February 2019, she was employed as an FSN/LES, serving as an Immigration Assistant at the USCIS field office at the U.S. Embassy in Moscow.  There, DEFENDANT 3 had access to WRAPS.  The evidence demonstrates that DEFENDANT 3 was directed by SAAD and that she used her access to WRAPS to steal records and information that she later sent to SAAD.

34.     DEFENDANT 3's duties typically included processing refugee applications from individuals in former Soviet Bloc countries.  Her duties did not include processing applications under the Iraq P-2 program, except for a short period—between on or about January 26, 2016, and on or about April 29, 2016—when she participated in a circuit ride to Amman, Jordan.  DEFENDANT 3 lost access to WRAPS when the Moscow USCIS field office closed in March 2019, and her USCIS employment ended.  Coconspirators sometimes referred to DEFENDANT 3 as "the doctor."

**Evidence Establishing the Conspiracy to Steal and to Defraud**

*SAAD's Post-Employment Access to WRAPS, Aided by DEFENDANT 3*

35.     After SAAD's USCIS employment ended in January 2016, he continued to access WRAPS remotely, and unlawfully, for several months.  DEFENDANT 3 sought to assist him in this, even though she was aware that SAAD was no longer employed by USCIS and that it was therefore unlawful for SAAD to access to the system.

36.     Specifically, on or about February 6, 2016, with knowledge that SAAD was no longer employed with USCIS, DEFENDANT 3 sent an email from her Yahoo account to SAAD's Yahoo account with a link to access WRAPS remotely.  SAAD replied to the email, "Its not working."  DEFENDANT 3 then sent SAAD an email with the subject line "Try this one," which contained a different link to access WRAPS remotely.

37.     On or about February 8, 2016, DEFENDANT 3 forwarded from her USCIS email account to her Yahoo email account an email that contained two links to access WRAPS remotely. This email originated from a DHS network engineer who sent the information to another individual, who then forwarded it to DEFENDANT 3.  DEFENDANT 3 then forwarded that email from her Yahoo account to SAAD's Yahoo account.

38.     Although records reflecting SAAD's access to WRAPS prior to May 30, 2016 are not available, WRAPS audit records indicate that, between June 2016 and August 2016—that is, after SAAD's employment with the U.S. Government had been terminated—SAAD accessed at least 270 unique P-2 Iraq cases in WRAPS.

*DEFENDANT 3's Theft of Government Records and Information*

39.     Between in or around May 30, 2016, and late February 2019, based on WRAPS audit logs, DEFENDANT 3 accessed at least 591 unique Iraq P-2 cases in WRAPS—many of which she accessed multiple times—even though she had no legitimate reason to access those cases as part of her work.

11

40.     Moreover, between October 2018 and February 2019 alone, DEFENDANT 3 sent more than 700 screenshots or documents from WRAPS cases from her official USCIS email account to her personal Yahoo email.

41.     DEFENDANT 3 was aware of the auditing limitations of WRAPS I versus WRAPS II, and, in an apparent effort to conceal her unlawful conduct, purposely used WRAPS I.  She explained this in a communication in early 2019, stating to an FSN/LES she sought to recruit to the conspiracy: "it's all you need. WRAPS access. But you will do cases in the old WRAPS. Not the new one. Because old WRAPS is not monitored. I mean, nobody will monitor, believe me . . . nobody will monitor. You just need to do the picture somehow."  In response to the potential recruit's request for clarification, DEFENDANT 3 stated: "yes, WRAPS 1, WRAPS 1, only need WRAPS 1.  Anyway, you have two WRAPS, because if your password expires, you need WRAPS 2 to update your password.  So you'll have both . . . It's very good money, for nothing. You will start doing it, then, after your start doing it, first maybe you will be nervous, but then, when you are cautious of your environment, it's nothing, I mean, and you will realize, 'oh, it such easy money for nothing.'"

*Requests and Thefts in Early 2019*

42.     Evidence of the defendant's communications and conduct regarding certain WRAPS cases in early 2019 illustrate the nature and scope of the conspiracy and the role of each defendant.

43.     On or about January 8, 2019, DEFENDANT 3 and SAAD exchanged messages about access to WRAPS.  SAAD sent a message to DEFENDANT 3, "I bit you forgot the passwords," and DEFENDANT 3 replied, "I did not! But I have it written down somewhere."

DEFENDANT 3 then asked, "Hi, are you gonna send cases?" and "WRAPS works." SAAD replied "Tomorrow."

44.     On or about January 9, 2019, DEFENDANT 1 sent a message to SAAD, providing a list of thirteen case numbers for SAAD to send to DEFENDANT 3:  "[Case 1] [Case 2] [Case 3] [Case 4] [Case 5] [Case 6] [Case 7] [Case 8] [Case 9] [Case 10] [Case 11] [Case 12] [Case 13]: للدكتوره حبيبي."  The Arabic text translates to "My dear to the female doctor," a reference to DEFENDANT 3.

45.     On or about January 10, 2019, SAAD sent a message to DEFENDANT 3 containing the same list of case numbers:  "GM 🏵 🏵 [Case 1] [Case 2] [Case 3] [Case 4] [Case 5] [Case 6] [Case 7] [Case 8] [Case 9] [Case 10] [Case 11] [Case 12] [Case 13]."

46.     WRAPS audit logs show that, on or about the same day, DEFENDANT 3 viewed each of the cases in WRAPS.  DEFENDANT 3 then sent WRAPS screenshots and documents from her USCIS Government email to her Yahoo email—and, from there, to SAAD's Yahoo email.

47.     On or about January 10, 2019, DEFENDANT 3 sent a message to SAAD stating, "Hi, I sent you one portion. The other one is pending! Cell phone connection is awful here. ☹,"and a subsequent message stating, "I sent the rest now."  Based on these messages, it appears that, after DEFENDANT 3 would obtain screenshots and documents from her USCIS email account to her Yahoo account, she would sometimes attempt to forward the Yahoo email to SAAD by using a smartphone.

48.     On January 11, 2019, SAAD sent DEFENDANT 3 messages stating, "Hello," "Received 7 cases," "The rest for tomorrow??," "Oh…just received them all," and "Thanks!!!!" DEFENDANT 3 responded, referring to her WhatsApp messaging application, "I sent you the

rest now! It's crazy my what's app did not work! These fuckers block internet."  SAAD

responded "Aha," to which DEFENDANT 3 replied "We can't use wifi in the embassy, that's

the problem."

49.     On January 14, 2019, DEFENDANT 3 sent a message to SAAD "Just check your

email daily after 12 pm because my what's app does not work at the embassy 🙂," referring to

WhatsApp, which the defendants often used in the course of the conspiracy.

50.     DEFENDANT 3 had viewed each of the thirteen requested cases before and after

January 10, 2019, indicating prior and subsequent requests for records and information about

those cases, and demonstrating an ongoing effort to monitor these cases.  Specifically, email

records show that, between October 10, 2018, and February 22, 2019, DEFENDANT 3 sent

screenshots or documents from her Government email to her Yahoo email several times, as

follows:  Case 1 (11 times); Case 2 (15 times); Case 3 (9 times); Case 4 (1 time); Case 5

(3 times); Case 6 (5 times); Case 7 (15 times); Case 8 (3 times); Case 9 (10 times); Case 10

(7 times); Case 11 (6 times); Case 12 (5 times); Case 13 (1 time).

*Targeting Particularly Sensitive Records and Information*

51.     DEFENDANT 1 and SAAD's requests for certain records and information

demonstrate an intent to steal records and information from WRAPS that are particularly

sensitive.  For example, in a message to SAAD on January 27, 2019, DEFENDANT 1 listed

approximately 12 Iraq P-2 cases with instructions to "withdraw the files, withdraw the story

interview first, then the military files."  Likewise, in a February 20, 2019, email from SAAD to

DEFENDANT 3, SAAD instructed DEFENDANT 3 to obtain the "status" of three Iraq P-2

cases, and, as to three other such cases, stated, "need CIS interview," an apparent reference to

records or information regarding a USCIS interview.

14

*A Case Study Indicating the Apparent Use of Stolen WRAPS Records and Information*

52.     Refugee Applicant 1 was an Iraqi national who submitted an application to the

P-2 Iraq program on or about December 24, 2014.  A timeline of the defendants' efforts to steal

WRAPS records and information regarding Refugee Applicant 1's case strongly suggests that

Refugee Applicant 1 benefitted from access to the stolen records and information—specifically,

by using the information to prepare for a USCIS interview and thereby improve his chances of

resettlement under the USRAP.

53.     Refugee Applicant 1's application was uploaded to the WRAPS system on or

about January 22, 2015.  Refugee Applicant 1's application included a letter on Company 1

letterhead, which purported to verify that he was employed by Company 1 fulfilling contracts

with the U.S. Government.

54.     Refugee Applicant 1 was interviewed by USCIS in November 2015, and the

interviewing officer notes, memorialized in WRAPS, indicated that the officer did not believe

Refugee Applicant 1 had provided credible testimony regarding all material facts in the case.

55.     After Refugee Applicant 1's interview, his WRAPS case file was reviewed within

USCIS.  Following that review, USCIS ordered a re-interview of Refugee Applicant 1, and in

August 2016, a USCIS employee uploaded a document to Refugee Applicant 1's case file in

WRAPS that included topics to cover and questions to ask during a re-interview.  The questions

were designed in response to the initial assessment that Refugee Applicant 1's prior interview

answers were not credible.

56.     On November 1, 2018, DEFENDANT 3 accessed and downloaded from WRAPS

the re-interview document prepared by USCIS.  On that same date, she sent the downloaded

document, along with a number of other WRAPS screenshots, from her USCIS account to her

Yahoo account.  Thereafter, she forwarded the files from her Yahoo account to SAAD, who immediately sent the files to DEFENDANT 1.

57.     On November 18, 2018, Refugee Applicant 1 was re-interviewed and found to be credible by the interviewing officer.

58.     DEFENDANT 3 accessed Refugee Applicant 1's case again in WRAPS on November 19, 21, 23, 26, 27, and 29, 2018, indicating that she was tracking the status of the case.  On or about December 13, 2018, DEFENDANT 3 accessed Refugee Applicant 1's WRAPS case and obtained a screenshot of the case status, which included sensitive, non-public notes regarding the case.  On the same day, she forwarded the screenshot from her USCIS email to her Yahoo email, and from her Yahoo email to SAAD, who forwarded it to DEFENDANT 1.

59.     On or about January 16, 2019, DEFENDANT 1 sent a message to SAAD containing Refugee Applicant 1's WRAPS case number.  On or about January 17, 2019, SAAD then sent the same information to DEFENDANT 3, who accessed her WRAPS account and obtained information about Refugee Applicant 1's case.  DEFENDANT 3 then sent an email containing information from Refugee Applicant 1's case in WRAPS to SAAD, who forwarded the email to DEFENDANT 1.

60.     On January 31, 2019, the defendants repeated this process, with a request regarding Refugee Applicant 1's case travelling from DEFENDANT 1 to SAAD to DEFENDANT 3, and WRAPS information regarding the case travelling from DEFENDANT 3 to SAAD to ADBDULJABBAR. In addition, on February 20, 2019, SAAD sent an email to DEFENDANT 3's Yahoo account asking for Refugee Applicant 1's refugee case information.

61.     Based on the timeline of events regarding Refugee Applicant 1's case, and based on similar patterns observed with respect to other cases about which the defendants stole records

and information, it is apparent that one purpose of the conspiracy was to provide refugee applicants with sensitive, non-public records and information regarding their applications—likely in exchange for money—and that the refugee applicants used the stolen records and information to their advantage in navigating the USRAP.

62.     This conclusion—that DEFENDANT 1 was selling stolen records and information to refugee applicants—is bolstered by the evidence demonstrating that DEFENDANT 1 possessed employment verification documents and that such documents were provided by applicants in support of their applications for the Iraq P-2 program.

*Payments to DEFENDANT 3*

63.     Between in or around June 2017 and February 2019, DEFENDANT 1 sent DEFENDANT 3 19 payments through a U.S. financial services company, with a total value of approximately $20,000 U.S. dollars.

64.     Between in or around July 2017 and August 2017, SAAD sent DEFENDANT 3 two payments through a U.S. financial services company, with a total value of approximately $2,500 U.S. dollars.

*Attempts to Recruit Additional Conspirators with WRAPS Access*

65.     In anticipation of the USCIS field office closures scheduled to begin with the USCIS Moscow field office in March 2019, SAAD and DEFENDANT 3 engaged in several WhatsApp communications regarding efforts to recruit potential coconspirators who still had WRAPS access or who could obtain access through their employment

66.     On December 26, 2018, DEFENDANT 3 sent a message to SAAD, stating that she had met someone—referred to here as Recruit 1— from IOM in another country.  She wrote, "He kind of likes me I think, So, I'm going to ask him later if he is interested to make more $,"

to which SAAD replied "Yessssssssssssss," "Great idea," and "Check and let me know."

DEFENDANT 3 responded "Ok." On February 9, 2019, DEFENDANT 3 wrote to SAAD, "I

need to contact my iom contact about cases."  SAAD replied, "when you gonna talk to him?"

DEFENDANT 3 responded that she was "cooking now breakfast 😄," to which SAAD replied,

"no rush."

67.     On February 20, 2019, DEFENDANT 3 sent a message to SAAD, stating, "I'll try

to talk to that person about doing cases for you . . . ."  SAAD replied "yes pls."  After SAAD

indicated that he wished for DEFENDANT 3 to continue recruiting potential coconspirators,

DEFENDANT 3 inquired of SAAD, "how much are you going to pay? Because I need to say

something, right?" followed by, "To tempt him 😄."  SAAD replied to DEFENDANT 3, "listen

we are partner in this . . . ," "I mean, if the work still going on," "Ill half my share with you . . . ,"

and "could he accept 800$."  DEFENDANT 3 replied, "You told me about it . . .  So I tell him

what $500?" and "Maybe he will accept $500."  SAAD agreed with DEFENDANT 3, writing,

"500-800 is good," "the rest of thousand will go to u," and "😄."

68.      In another conversation between DEFENDANT 3 and SAAD about continuing to

recruit co-conspirators, DEFENDANT 3 wrote on February 20, 2019, about Recruit 1 and

another person, Recruit 2, who apparently worked in another country.  DEFENDANT 3 wrote,

"look, I have two guys to talk to. First I'll ask [Recruit 2]," to which SAAD replied, "leave

[Recruit 2] last option."  "If he does not agree," DEFENDANT 3 wrote, "I ask [Recruit 1] . . . ,"

"I know [Recruit 1] more," and "In [Recruit 1's country], they have video cams everywhere."

69.     SAAD responded, "ok you decide," but he instructed DEFENDANT 3 that, "for

[Recruit 2] . . . ," "dont talk about money."  DEFENDANT 3 pushed back, explaining, "I'll tell

him $500 . . . ," "because he had loans to pay."  After a further back-and-forth, SAAD instructed

DEFENDANT 3 to "just tell him . . . need status . . . the whole process will take around 30 min . . . ," "and will give him monthly salary." He added, "for [Recruit 2] . . . tell him the same story. and you can bargain him . . . range 500-800$." SAAD concluded this conversation, "listen lets talk whenever you have time," "before talking to the guys," to which DEFENDANT 3 agreed, "Ok, it's better. Tonight."

70.     On February 22, 2019, DEFENDANT 3 and SAAD discussed the prospects of recruiting an FSN/LES in another country who was known to DEFENDANT 3 and is referred to here as Recruit 3. SAAD asked DEFENDANT 3, "have you talked with her?" DEFENDANT 3 responded, "Not yet! I will text her from home today." SAAD wrote to DEFENDANT 3, "ok dear," "practice ur skills," "in negotiations...", "Middle East count on u." DEFENDANT 3 responded to SAAD, "we will talk tonight, she will text me 😎," to which SAAD responded, "ok great" and "prepare for it."

71.     On February 27, 2019 SAAD wrote to DEFENDANT 3, referencing the end of her employment based on the closure of the USCIS field office:  "I know I was late with the payment but Ill do my best for tonight," "your last day is Thursday right??" "can we do anything re the new partner😊," and "is [Recruit 3] still thinking??" DEFENDANT 3 responded, "My last day is Thursday. I go on vacation . . . ." and "Wraps did not send me password. Maybe they were told to turn me off because DHS Moscow is closing?" She further wrote, "[Recruit 3] . . . does not have access to DHS computer because they have not connected them yet." SAAD replied, "hope she will be in!!" Later that same day, DEFENDANT 3 stated to SAAD, "[Recruit 3] said she will let me know once she gets access back," and "Crap! I don't have wraps access either." SAAD asked, "do you think [Recruit 3] is positive . . . or she procrastinates to say NO." DEFENDANT 3 replied, "I think she is positive" and "Let's wait a little?"

72.     While SAAD and DEFENDANT 3 communicated about Refuing additional coconspirators and about payments to DEFENDANT 3, SAAD communicated directly with DEFENDANT 1 regarding the status of the scheme. For example, approximately one minute after DEFENDANT 3 and SAAD communicated on February 27, 2019, as noted above, DEFENDANT 1 sent a message to SAAD, stating in Arabic, "I am going to transfer money to her tonight" and "tell [DEFENDANT 3] not to worry."  SAAD replied in Arabic, "I spoke with her," "her last day is tomorrow," and "she spoke with another person."  DEFENDANT 1 responded positively, and SAAD added "God will this person will accept the offer." DEFENDANT 1 responded to SAAD, asking, "does that mean she is done?" and "so what do you think? According to her, does she trust her friend to get the job done?"  DEFENDANT 1 further inquired, "I mean, if your words are accurate, how much time does she need to accept a starting date?"  SAAD then assured DEFENDANT 1, "I would say she should be with us next week."

73.      Approximately one hour after this exchange of messages between DEFENDANT 1 and SAAD, DEFENDANT 1 transferred $1041.66 to DEFENDANT 3 through a U.S. financial services company

74.     In reaching out to Recruit 3, DEFENDANT 3 and SAAD used a pseudonym for SAAD, "Hani," and described the scheme to steal WRAPS records and information as an altruistic endeavor—that is, an effort in which "Hani," a former IOM employee, was only interested in providing desperate refugees a status check on their refugee applications.

75.     DEFENDANT 3 texted SAAD, "It's better not to tell her your name" and "Let's call you other name," and SAAD responded, "do whatever it right." DEFENDANT 3 suggested, "you will be Mustafa 😊," and SAAD responded "tell her expatriate used to work at IOM,"

"Jack," and "give her not middle eastern name."  DEFENDANT 3 responded to SAAD, "it's kind of strange if some expatriate wants to buy information . . .  Better someone local," and "Expats make good money."  SAAD then responded "no longer with Iom," and DEFENDANT 3 replied, "Like guy who used to work in iom," to which SAAD wrote, "he open his own business," to which DEFENDANT 3 agreed, "yes."

      76.    On February 28, 2019, SAAD wrote to DEFENDANT 3 to "pls do ur best with [Recruit 3]," "she is the last hope . . . ," and "we have mortgage."   DEFENDANT 3 then relayed to SAAD that Recruit 3 was concerned about getting in trouble for her actions, DEFENDANT 3 explained, "[Recruit 3] said she needs to make sure if she could technically do it without being caught."  SAAD replied, "tell her . . . she is not needed do them at once," "she can take her time," and "8 hours could take 1000 cases pic," and "not 10."  DEFENDANT 3 responded, "Yes, I will tell her."

## **Conclusion**

For the reasons stated above, there is probable cause that DEFENDANT 1, SAAD, and

DEFENDANT 3, in violation 18 U.S.C. § 371, conspired with one or more persons to violate 18

U.S.C. § 641, and conspired with one or more persons to defraud the United States.

I declare under penalty of perjury that the information provided above is true and correct

to the best of my knowledge.

_____
Gregory Ellis Newman
Special Agent
Diplomatic Security Service

Subscribed and sworn before me on this 1st day of November, 2019

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE