**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on January 8, 2020**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| **v.** | : | **Grand Jury Original** |
| **AWS MUWAFAQ ABDULJABBAR,**<br>**Also known as**<br>**Aws Mwafaq Abdal Jabbar Hilmi,**<br>**Aous Mofaq Abdaljabar Hailmi,** | : | **VIOLATIONS:**<br><br>**18 U.S.C. § 371**<br>**(Conspiracy to Commit Theft of Public Records and Defraud the United States)** |
| **HAITHAM ISA SAADO SAD,**<br>**Also known as**<br>**Haitham Sa'ad, and** | : | **18 U.S.C. § 641**<br>**(Theft of Public Records)** |
| **OLESYA LEONIDOVNA KRASILOVA,** | : | **18 U.S.C § 1030**<br>**(Fraud and Related Activity in Connection with Computers)** |
| **Defendants.** | : | **18 U.S.C. § 1956**<br>**(Money Laundering)**<br><br>**18 U.S.C. § 2**<br>**(Aiding and Abetting)**<br><br>**Forfeiture:**<br>**18 U.S.C. § 981(a)(1)(C)**<br>**18 U.S.C. § 982(a)(1)**<br>**18 U.S.C. § 1030(i) and (j)**<br>**28 U.S.C. § 2461(c)**<br>**28 U.S.C. § 853(p)** |

## **INDICTMENT**

The grand jury charges that:

## **COUNT ONE**

At all times material to this Indictment:

**U.S. Refugee Admissions Program**

1. A refugee was defined under U.S. law as a person who is outside his or her country of origin and is unable or unwilling to return because of past persecution or a well-founded fear of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group.

2. The United States Refugee Admissions Program (USRAP) was created by the Executive Branch and authorized by Congress to facilitate the admission and resettlement of refugees in the United States. Applications to the United States for refugee resettlement were processed through the USRAP, which was overseen by the U.S. Department of State's Bureau of Population, Refugees, and Migration (PRM), in cooperation with U.S. Citizenship and Immigration Services (USCIS), a component of the Department of Homeland Security (DHS). The U.S. Department of Health and Human Services (HHS), through its Office of Refugee Resettlement, also played a role in the USRAP by assisting and providing resources to resettled refugees.

3. As a general matter, eligible refugee applicants fell within one of three broad categories, referred to as "priorities." Priority 1 (P-1) included, among others individuals, those referred from the United Nations High Commissioner for Refugees; Priority 2 (P-2) covered groups of special humanitarian concern, often based on a group's ethnic, religious, or national identity; and Priority 3 (P-3) referred to applications for the purpose of family reunification.

4. The Refugee Crisis in Iraq Act, signed into law in 2008, created a P-2 program of the USRAP, the Iraq P-2 program, which allowed certain Iraqis to apply directly to the USRAP for resettlement in the United States. Eligible applicants included Iraqis who worked as interpreters or translators for the U.S. Government or multinational forces; worked for the U.S.

Government, its contractors, or grantees in Iraq; worked for U.S.-based media or nongovernmental organizations; or were a close relative of an eligible applicant.

5. With some exceptions, refugee applications to the USRAP, including the Iraq P-2 program, were initiated at one of several Resettlement Support Centers (RSCs), which were run by international or nongovernmental organizations located abroad and working pursuant to a contract with the U.S. Department of State (State Department) to process applications in specific geographic regions. RSCs were responsible for, among other things, the initial processing of applications and screening of applicants for eligibility under the USRAP.

6. The RSC Middle East and North Africa (MENA) was based in Amman, Jordan, and operated by the International Organization for Migration (IOM) under a contract with the State Department. Processing of applications under the Iraq P-2 program was available at the RSC MENA, among other locations in the Middle East and North Africa. The RSC Eurasia was based in Moscow, Russia, and it was also run by IOM under a contract with the State Department.

7. USCIS was responsible for security checks and adjudication of all refugee applications. The vetting of applicants included biographic and biometric checks against an array of immigration, law enforcement, and U.S. Intelligence Community (USIC) databases, as well as mandatory, in-person applicant interviews. Often, USCIS's initial assessment of an application and applicant would trigger additional investigation, security checks, and interviews.

8. To fulfill its responsibilities under the USRAP, USCIS maintained field offices located within U.S. embassies, including those in Amman and Moscow. Within those field offices, USCIS, like many U.S. Government agencies operating abroad, commonly employed foreign nationals, known as "foreign service nationals" (FSNs) or "locally engaged staff" (LES).

9. USCIS staff at international field offices were typically responsible for assisting with the processing and adjudication of refugee applications within their own geographic region.

Occasionally, when there was a high volume of refugee applications in a particular region, USCIS staff, including FSNs/LES, would participate in a "circuit ride," in which the staff would travel to a region on a temporary basis to provide assistance.

10. In or around 2018, USCIS began a phased effort to close its international field offices, consolidating USCIS international operations to offices within the United States. The USCIS field office in Moscow, for example, was closed to the public on or about February 28, 2019, and it closed permanently on or about March 29, 2019.

**Worldwide Refugee Admissions Processing System**

*Records and Information in WRAPS and Limitations on Use*

11. USRAP applications, or "cases," were tracked in the Worldwide Refugee Admissions Processing System (WRAPS), which was managed by the Refugee Processing Center (RPC), a component of PRM located in the United States. WRAPS connected the multiple U.S. Government agencies and other entities comprising the USRAP, and it served as the information management system for the refugee application, adjudication, and resettlement process. Access to WRAPS was limited to authorized personnel, which included certain USCIS employees, including certain FSN/LES employees located at field offices abroad.

12. For each USRAP case, WRAPS contained substantial information that was treated as confidential, including: personal identifying information of applicants and their family members; applicants' employment history, prior military service, and their accounts of persecution or fear of persecution; the results of security checks; questions and answers from USCIS interviews and proposed questions for future interviews; analyses of applicants' USRAP eligibility; and assessments of applicants' credibility and any potential threat they posed to U.S. public safety or national security. In addition to data that was entered into WRAPS, the system also allowed users

to upload and download documents, such as refugee applications, employment verifications, and USCIS interview outlines.

13. WRAPS records were tracked by case numbers, which included a prefix reflecting the location in which the case was initiated (and not the country of origin of the applicant). For example, cases originating at the RSC in Jordan, regardless of the applicant's nationality, would have a case number such as "JO-12345," with the "JO" indicating that the application was initiated in Jordan. Other abbreviations included "IZ" for Iraq and "EG" for Egypt.

14. WRAPS was governed by "Rules of Behavior," which users were required to read, understand, and sign, and which made clear that, among other things, WRAPS was "strictly for the purpose of refugee processing to support the [USRAP] only"; users "must never attempt to access information [they] are not authorized to access, which is not necessary for [them] to perform [their] job, or which is inappropriate or unnecessary to access"; and users "must never make a copy of sensitive information on a screen by taking a picture of it, capturing a screenshot, recording a video, or similar activities unless the image will remain on the WRAPS system and be stored in an appropriate location with access control." In addition, every time a WRAPS user logged into the system, they were required to acknowledge that they were accessing a U.S. Government database containing sensitive information and that "WRAPS is strictly for the purpose of refugee processing to support the U.S. Refugee Admissions Program."

*WRAPS I and WRAPS II*

15. The current version of WRAPS, known as "WRAPS II," was introduced in or around 2013, and it replaced an earlier, original version, known as "WRAPS I." WRAPS I remained operational, however, and, at least until in or about 2019, a user could access WRAPS I through a particular URL and could view or download the same information available in WRAPS

II. If a user of WRAPS I needed to reset their password, however, the user would need to do that within WRAPS II.

16. In contrast to WRAPS I, WRAPS II included an updated interface that displayed the name of the user who was logged into the system at that time; the WRAPS I display did not contain that information. Thus, a screenshot of the WRAPS II interface would capture the name of the user that is displayed on the screen, while a screenshot of WRAPS I would not. In addition, WRAPS II contained certain audit features that allowed for administrators to see when users had logged in or out of the system or had reset their password.

*The Importance of Confidentiality of WRAPS Records and Information*

17. In administering the USRAP, it was critically important that the State Department, DHS, and other agencies and employees involved in the USRAP ensure that sensitive U.S. Government records and information—including the records and information sought by the defendants—be kept confidential, non-public, and not available to unauthorized persons. This confidentiality permitted the agencies to administer the program fairly and lawfully, to protect the United States from threats to public safety and the national security, and, consistent with U.S. and international law, to assist foreign persons fleeing persecution, including by resettling them in the United States.

18. The theft or receipt of sensitive records or information in WRAPS by unauthorized persons creates a number of risks. For example, if an applicant is provided confidential records or information from WRAPS regarding their own case—such as security check results, interview questions, or internal assessments of an applicant's credibility—that applicant could use the records or information to their advantage and potentially secure admission to the United States through the USRAP when that would not otherwise have occurred. Such fraud increases the risk to public safety and national security of the United States. Furthermore, because the number of

refugee admissions to the United States are annually capped by the President in consultation with Congress, such an outcome would also likely preclude the admission of qualified refugee applicants who would otherwise be resettled in the United States.

The Defendants

19. Defendant **AWS MUWAFAQ ABDULJABBAR**, also known as **AWS MWAFAQ ABDAL JABBAR HILMI**, and **AOUS MOFAQ ABDALJABAR HAILMI** (hereafter "**ABDULJABBAR**"), was a citizen of Iraq who has lived in Jordan since in or around 2010. **ABDULJABBAR** previously applied for refugee resettlement in the United States, but his application was denied.

20. Defendant **HAITHAM ISA SAADO SAD**, also known as **HAITHAM SA'AD** (hereafter "**SAD**"), was a citizen and resident of Jordan. From in or around November 2007 until in or around January 2016, he was employed by USCIS as an FSN/LES, serving as an Immigration Assistant at the U.S. Embassy in Amman. As part of his duties, SAD had access to WRAPS.

21. Defendant **OLESYA LEONIDOVNA KRASILOVA** (hereafter "**KRASILOVA**") was a Russian citizen living in Moscow. From in or around August 2011 until in or around February 2019, she was employed as an FSN/LES, serving as an Immigration Assistant at the USCIS field office at the U.S. Embassy in Moscow. There, **KRASILOVA** had access to WRAPS.

22. **KRASILOVAS**'s duties typically included processing refugee applications from individuals in former Soviet Bloc countries. Her duties did not include processing applications under the Iraq P-2 program, except for a short period—between on or about January 26, 2016, and on or about April 29, 2016—when she participated in a circuit ride to Amman, Jordan. **KRASILOVA** lost access to WRAPS when the Moscow USCIS field office closed in or around

March 2019, and her USCIS employment ended. Co-conspirators sometimes referred to **KRASILOVA** as "the doctor."

**The Conspiracy**

23. Beginning no later than in or around February 2016, and continuing until at least in or around April 2019, the exact dates being unknown to the grand jury, in the Russian Federation, the Hashemite Kingdom of Jordan, and elsewhere, and pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia, **ABDULJABBAR, SAD, KRASILOVA**, and others known and unknown to the grand jury, did knowingly combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, Title 18, United States Code, Section 641, and to defraud the United States, all in violation of Title 18, United States Code, Section 371.

**Objects of the Conspiracy**

24. The objects of the conspiracy were:

a. To steal from the United States Government information contained within the WRAPS database;

b. To distribute the stolen information to individuals who did not have lawful access to it; and

c. To impair, obstruct, and defeat by dishonest means the lawful government functions of the United States, to wit, the U.S. Refugee Admissions Program administered by PRM and USCIS.

**Manner and Means of the Conspiracy**

25. **ABDULJABBAR, SAD, KRASILOVA**, and their co-conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

a. **ABDULJABBAR** would provide **SAD** lists of WRAPS refugee case numbers about which he wanted information.

b. **SAD** would access his WRAPS account, even after his employment with USCIS was terminated, and obtain the requested information or send the list of WRAPS refugee case numbers provided by **ADBULJABBAR** to **KRASILOVA**.

c. **KRASILOVA** would access her WRAPS account, obtain the requested information about the requested WRAPS refugee case numbers, and send screenshots of this information to **SAD** via email and other electronic means.

d. **SAD** would send the information he obtained from the WRAPS database and from **KRASILOVA** to **ABDULJABBAR** by email and other electronic means.

e. **ABDULJABBAR** and **SAD** would provide payment to **KRASILOVA** for the stolen information via a U.S. monetary services provider that involved the transport, transmission, or transfer of a monetary instrument or funds to a place in the United States from or through a place outside the United States and the transport, transmission, or transfer of a monetary instrument or funds from a place in the United States to or through a place outside the United States.

f. **ABDULJABBAR**, **SAD**, and other co-conspirators would use this purloined information to interfere with the proper and lawful government function of screening, vetting, and assessing applicants for refugee placement in the United States.

**Overt Acts**

26. In furtherance of this conspiracy, and to accomplish its purposes and objects, at least one of the conspirators committed or caused to be committed, at least one of the following overt acts, among others:

a. On or about February 6, 2016, with knowledge that **SAD** was no longer employed with USCIS, **KRASILOVA** sent an email from her personal email acount to **SAD**'s personal email account that contained a link to access WRAPS from the internet.

b. On or about February 6, 2016, **SAD** replied to the email described in Overt Act a, and told **KRASILOVA**, "Its not working [sic]."

c. On or about February 6, 2016, **KRASILOVA** sent an email from her personal email acount to **SAD**'s personal email account, with the subject line "Try this one," which contained a different link to access WRAPS from the internet.

d. On or about February 8, 2016, **KRASILOVA** forwarded an email from a Senior Network Engineer employed by USCIS, which contained two links to access WRAPS from the internet, from her USCIS email account to her personal email email account.

e. On or about February 8, 2016, **KRASILOVA** forwarded the email described in Overt Act d from her personal email account to **SAD**'s personal email account.

f. Between on or about May 1, 2017, and on or about June 18, 2017, **KRASILOVA** accessed at least 88 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

g. On or about June 18, 2017, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,538.46 United States Dollars ("USD") via a U.S. financial services company to a place in the United States from or through a place outside the United States.

h. Between on or about June 19, 2017, and on or about July 15, 2017, **KRASILOVA** accessed at least 91 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

i. On or about July 15, 2017, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,538.46 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

j. Between on or about July 16, 2017, and on or about August 19, 2017, **KRASILOVA** accessed at least 107 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

k. On or about August 19, 2017, **SAD** sent **KRASILOVA** a payment worth approximately $1,547.98 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

l. Between on or about August 19, 2017, and on or about September 19, 2017, **KRASILOVA** accessed at least 95 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

m. On September 19, 2017, **SAD** sent **KRASILOVA** a payment worth approximately $1,031.98 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

n. Between on or about September 20, 2017, and on or about October 23, 2017, **KRASILOVA** accessed at least 104 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

o. On or about October 23, 2017, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,044.93 USD via a U.S. financial services

company to a place in the United States from or through a place outside the United States.

p. Between on or about October 24, 2017, and on or about November 21, 2017, **KRASILOVA** accessed at least 108 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

q. On or about November 21, 2017, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,044.93 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

r. Between on or about November 22, 2017, and on or about December 20, 2017, **KRASILOVA** accessed at least 104 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

s. On or about December 20, 2017, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,044.93 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

t. Between on or about December 21, 2017, and on or about January 22, 2018, **KRASILOVA** accessed at least 58 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

u. On or about January 22, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,044.93 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

v. Between on or about January 22, 2018, and on or about March 1, 2018, **KRASILOVA** accessed at least 138 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

w. On or about March 1, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,044.93 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

x. Between on or about March 2, 2018, and on or about April 1, 2018, **KRASILOVA** accessed at least 110 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

y. On or about April 1, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,061.56 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

z. Between on or about April 2, 2018, and on or about April 28, 2018, **KRASILOVA** accessed at least 105 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

aa. On or about April 28, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,041.66 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

bb. Between on or about April 29, 2018, and on or about May 20, 2018, **KRASILOVA** accessed at least 51 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

cc. On or about May 20, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,041.66 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

dd. Between on or about May 21, 2018, and on or about June 27, 2018, **KRASILOVA** accessed at least 115 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

ee. On or about June 27, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,041.66 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

ff. Between on or about June 28, 2018, and on or about July 22, 2018, **KRASILOVA** accessed at least 104 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

gg. On or about July 22, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,041.66 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

hh. Between on or about July 23, 2018, and on or about August 26, 2018, **KRASILOVA** accessed at least 121 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

ii. On or about August 26, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,043.18 USD via a U.S. financial services

company to a place in the United States from or through a place outside the United States.

jj. Between on or about August 27, 2018, and on or about September 24, 2018, **KRASILOVA** accessed at least 93 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

kk. On or about September 24, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,043.18 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

ll. Between on or about September 25, 2018, and on or about October 27, 2018, **KRASILOVA** accessed at least 145 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

mm. On or about October 27, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,028.80 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

nn. Between on or about October 28, 2018, and on or about November 24, 2018, **KRASILOVA** accessed at least 127 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

oo. On or about November 1, 2018, **KRASILOVA** accessed her WRAPS account, and she took screenshots and downloaded information related to Refugee Applicant 1, an Iraqi P-2 refugee applicant. The information **KRASILOVA** downloaded contained sensitive non-public information about Refugee Applicant

1, including a credibility assessment and potential questions that would be asked of Refugee Applicant 1 in a planned re-interview of him.

pp. On or about November 1, 2018, **KRASILOVA** sent—from her USCIS account to her personal email account, and then to **SAD**—an email that contained the downloaded documents and screen shots **KRASILOVA** had taken from the WRAPS database regarding Refugee Applicant 1.

qq. On or about November 1, 2018, **SAD** forwarded the email described in Overt Act pp to **ABDULJABBAR**.

rr. On or about November 24, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,028.80 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

ss. Between on or about November 25, 2018, and on or about December 26, 2018, **KRASILOVA** accessed at least 110 unique refugee-application cases in WRAPS that involved Iraqi nationals applying for refugee status from Iraq or Jordan.

tt. On or about December 13, 2018, after Refugee Applicant 1 had been re-interviewed by USCIS staff, **KRASILOVA** accessed Refugee Applicant 1's WRAPS case and obtained a screenshot image of the case status, which included notes on Refugee Applicant 1's eligibility and adjudication.

uu. On or about December 13, 2018, **KRASILOVA** sent an email—from her USCIS account to her personal email and then to **SAD**—that included the screenshot image described in Overt Act tt.

vv. On or about December 13, 2018, **SAD** forwarded the email described in Overt Act uu to **ADBULJABBAR**.

ww. On or about December 26, 2018, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,041.66 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

xx. On or about January 8, 2019, **KRASILOVA** asked **SAD** whether he was going to send cases, adding, "WRAPS works."

yy. On or about January 8, 2019, **SAD** replied to **KRASILOVA**, and stated, "Tomorrow."

zz. On or about January 9, 2019, **ABDULJABBAR** sent to **SAD** a list of thirteen refugee case numbers, each of which corresponded to a unique P-2 refugee application submitted by an Iraqi national, along with a reference to **KRASILOVA**.

aaa. On about January 10, 2019, **SAD** sent a message to **KRASILOVA** that contained the same 13 case numbers previously sent to **SAD** by **ADBULJABBAR**.

bbb. On or about January 10, 2019, **KRASILOVA** accessed her WRAPS account and viewed all thirteen cases sent to her by **SAD**.

ccc. On or about January 10, 2019, **KRASILOVA** sent—from her USCIS email account to her personal email account, and from her personal email account to **SAD**—screenshots and documents from WRAPS that pertained to some of the 13 cases previously sent to her by **SAD**.

ddd. On or about January 10, 2019, **KRASILOVA** messaged **SAD** and told him that she had sent him a portion of the results.

eee. On or about January 11, 2019, **SAD** notified **KRASILOVA** that he had received all of the results and thanked her.

fff. On or about January 11, 2019, **KRASILOVA** explained to **SAD** that she could not send him all the results at once because "It's crazy my [direct message service] did not work! These fuckers block internet. . . . We can't use wifi in the embassy, that's the problem."

ggg. On or about January 16, 2019, **ABDULJABBAR** sent a message to **SAD** containing Refugee Applicant 1's WRAPS case number.

hhh. On or about January 17, 2019, **SAD** sent a message to **KRASILOVA** containing Refugee Applicant 1's WRAPS case number.

iii. On or about January 17, 2019, **KRASILOVA** accessed her WRAPS account and obtained information about, Refugee Applicant 1's case, among others.

jjj. On or about January 17, 2019, **KRASILOVA** sent an email—from her USCIS email account to her personal email account, and then to **SAD**, containing information she had just stolen from Refugee Applicant 1's case in WRAPS.

kkk. On or about January 17, 2019, **SAD** forwarded the email referenced in Overt Act jjj to **ABDULJABBAR**.

lll. On or about January 23, 2019, **ABDULJABBAR** sent **KRASILOVA** a payment worth approximately $1,041.66 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

mmm. On or about January 27, 2019, **ABDULJABBAR** sent a message to **SAD** that included a list of 12 Iraqi P-2 refugee applications with instructions to "withdraw the files, withdraw the story interview first, then the military files."

nnn. On or about January 31, 2019, **ABDULJABBAR** sent a message via a direct message service containing Refugee Applicant 1's WRAPS case number to **SAD**.

ooo. On or about January 31, 2019, **SAD** sent a message via a direct message service containing Refugee Applicant 1's WRAPS case number to **KRASILOVA**.

ppp. On or about January 31, 2019, **KRASILOVA** accessed her WRAPS account and obtained information about Refugee Applicant 1's case, among others.

qqq. On or about January 31, 2019, **KRASILOVA** sent an email—from her USCIS account to her personal email account, and then to **SAD**, containing information stolen from Refugee Applicant 1's case in WRAPS.

rrr. On or about January 31, 2019, **SAD** forwarded the email referenced in Overt Act qqq to **ABDULJABBAR**.

sss. On or about February 20, 2019, **SAD** sent an email to **KRASILOVA** in which he requested information about three Iraqi P-2 refugee applicants, including Refugee Applicant 1, as well as the USCIS interview of three separate Iraqi P-2 refugee applicants.

ttt. On or about February 20, 2019, **KRASILOVA** obtained a screenshot image of the case status of Refugee Applicant 1, as well information related to the other individuals mentioned by **SAD** as described in Overt Act sss, which she transmitted to **SAD** via email. **SAD** transmitted these materials to **ABDULJABBAR** via email on the same day.

uuu. On or about February 27, 2019, **ABDULJABBAR** sent **KRASILOVA** a payment of approximately $1,041.66 USD via a U.S. financial services company to a place in the United States from or through a place outside the United States.

(**Conspiracy to Commit Theft of Public Records and to Defraud the United States**, in violation of Title 18, United States Code, Sections 371 and 641).

**COUNT TWO**

27. The allegations in Paragraphs 1 through 26 of this Indictment are incorporated and realleged herein by reference.

28. Between in or around May 2016, and in or around February 2019, in the Hashemite Kingdom of Jordan, the Russian Federation, and elsewhere, and pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia, **SAD** and **KRASILOVA**, aided and abetted by each other and by **ABDULJABBAR**, did steal, purloin, and knowingly convert to their use, records and information relating to applications to the U.S. Refugee Admissions Program, those records and that information being of value to the United States and to any department and agency of the United States, and having an aggregate value in excess of $1,000 USD.

(**Theft of Public Records**, in violation of Title 18, United States Code, Section 641 and 2).

**COUNT THREE**

29. The allegations in Paragraphs 1 through 26 of this Indictment are incorporated and realleged herein by reference.

30. Beginning as early as on or about June 18, 2017, the exact date being unknown to the Grand Jury, and continuing through at least on or about February 27, 2019, in the Hashemite Kingdom of Jordan, the Russian Federation, and elsewhere, and pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia, **ABDULJABBAR, SAD,** and **KRASILOVA**, did knowingly combine, conspire,

confederate, and agree together and with other persons both known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(h).

**The Object of the Conspiracy**

31. It was the object of the conspiracy for **ABDULJABBAR, SAD**, and **KRASILOVA**, together and with other persons both known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(a)(2)(A), that is, by transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument and funds to a place in the United States from and through a place outside the United States, that is the Hashemite Kingdom of Jordan, with the intent to promote the carrying on of specified unlawful activity, to wit, an offense relating to a violation of Title 18, United States Code, Section 641.

(**Conspiracy to Commit Money Laundering,** in violation of Title 18, United States Code, Section 1956).

**COUNT FOUR**

32. The allegations in paragraphs 1 to 26 of this Indictment are incorporated and realleged herein by reference.

33. From on or about May 30, 2016, through on or about August 29, 2016, in the Hashemite Kingdom of Jordan, the Russian Federation, and elsewhere, and pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia, **SAD**, aided and abetted by **KRASILOVA**, for private financial gain gain and in furtherance of criminal acts as alleged in Counts One and Two of this indictment, without authorization and in excess of authorization, intentionally accessed a computer and thereby obtained information from a department or agency of the United States.

(**Fraud and Related Activity in Connection with Computers** in violation of Title 18, United States Code, Section 1030(a)(2)(B), (c)(2)(B) and 2)

**FORFEITURE ALLEGATION**

34. Upon conviction of any of the offenses alleged in Counts One or Two of this Indictment, the defendants shall forfeit to the United States any property, real or personal, which constitutes, or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to these offenses.

35. Upon conviction of the offense alleged in Count Three of this Indictment, the defendants shall forfeit to the United States any property, real or personal, involved in this offense, or any property traceable to such property pursuant to Title 18, United States Code, Section 982(a)(1). The United States will also seek a forfeiture money judgment against the defendants for a sum of money equal to the value of any property, real or personal, involved in this offense, and any property traceable to such property.

36. Upon conviction of the offense alleged in Count Three of this Indictment, the defendants shall forfeit to the United States: (a) the defendants' interest in any personal property that was used or intended to be used to commit or to facilitate the commission of these violations; (b) any property, real or personal, constituting or derived from, any proceeds the defendants obtained, directly or indirectly, as a result of these violations; (c) any personal property used or intended to be used to commit or to facilitate the commission of these violations; and (d) any property, real or personal, which constitutes or is derived from proceeds traceable to these violations, pursuant to 18 U.S.C. §§ 1030(i) and (j). The United States will also seek a forfeiture money judgment against the defendants equal to the value of this property.

37. If any of the property described above as being subject to forfeiture, as a result of

any act or omission of the defendants:

A. cannot be located upon the exercise of due diligence;

B. has been transferred or sold to, or deposited with, a third party;

C. has been placed beyond the jurisdiction of the Court;

D. has been substantially diminished in value; or

E. has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(1), Title 18, United States Code, Sections 1030(i) and (j), and Title 21, United States Code, Section 853(p)).

A TRUE BILL

FOREPERSON

Timothy J. Shea/dc
Attorney of the United States in
and for the District of Columbia