UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **CRIMINAL NO. 1:20-cr-63 (RC)** |
| v. | : | |
| | : | |
| HAITHAM SAD | : | |
| | : | |
| Defendant. | : | |

**STATEMENT OF OFFENSE**

Pursuant to the Federal Rules of Criminal Procedure 11, the United States and Defendant

HAITHAM ISA SAADO SAD, also known as HAITHAM SA'AD, stipulate and agree that the

following facts are true and accurate. These facts do not constitute all facts known to the parties

concerning the charged offenses and covered conduct. This statement is being submitted by the

parties to demonstrate that sufficient facts exist to establish that the defendant committed the

offenses to which he is pleading guilty.

The government's evidence includes, but is not limited to, the following:

**Summary**

1.      Applications for refugee resettlement in the United States are processed and

adjudicated under the U.S. Refugee Admissions Program (USRAP), a federal interagency program

involving, among other agencies, the U.S. Department of State and U.S. Department of Homeland

Security (DHS).   Cases in the USRAP are tracked within the Worldwide Refugee Admissions

Processing System (WRAPS), a State Department database containing sensitive U.S. records and

information.

2.      From November 2007 until January 2016, SAD, a citizen of Jordan, was employed

as a "foreign service national" or "locally-employed staff" (FSN/LES) at the U.S. Embassy in

Amman, working as an Immigration Assistant for U.S. Citizenship and Immigration Services (USCIS), a component of the U.S. Department of Homeland Security (DHS).   As part of his job responsibilities, SAD had access to WRAPS.

3.      Beginning not later than February 2016, and continuing until at least April 2019, SAD knowingly and intentionally conspired with AWS MUWAFAQ ABDULJABBAR (an Iraqi living in Amman), OLESYA KRASILOVA, (a Russian and former FSN/LES living in Moscow, Russia), and others to steal U.S. Government property—that is, sensitive U.S. Government records and information contained in WRAPS.   In so doing, SAD, ABDULJABBAR, KRASILOVA, and others likewise conspired to defraud the United States by impairing the lawful government functions of the State Department and DHS through deceptive means.

4.      As described below, following his termination in 2016, SAD, without authorization, continued to access WRAPS in order to steal records and information, thereby violating the Computer Fraud and Abuse Act.   Moreover, to promote their unlawful activities, SAD, ABDULJABBAR, KRASILOVA, and others conspired to launder money by sending and receiving funds through the United States.

### U.S. Refugee Admissions Program (USRAP)

5.      A refugee is defined under U.S. law as a person who is outside his or her country of origin and is unable or unwilling to return because of past persecution or a well-founded fear of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group.

6.      The USRAP was created by the Executive Branch and authorized by Congress to facilitate the admission and resettlement of refugees in the United States.   Applications to the

United States for refugee resettlement are processed through the USRAP, which is overseen by the State Department's Bureau of Population, Refugees, and Migration (PRM), in cooperation with USCIS. The U.S. Department of Health and Human Services (HHS), through its Office of Refugee Resettlement, also plays a role in the USRAP by assisting and providing resources to resettled refugees.

7.      As a general matter, eligible refugee applicants fall within one of three broad categories, referred to as "priorities." Priority 1 (P-1) includes, among others individuals, those referred from the United Nations High Commissioner for Refugees; Priority 2 (P-2) covers groups of special humanitarian concern, often based on a group's ethnic, religious, or national identity; and Priority 3 (P-3) refers to applications for the purpose of family reunification.

8.      The Refugee Crisis in Iraq Act, signed into law in 2008, created a P-2 program of the USRAP, the Iraq P-2 program, which allowed certain Iraqis to apply directly to the USRAP for resettlement in the United States. Eligible applicants included Iraqis who: worked as interpreters or translators for the U.S. Government or multinational forces; worked for the U.S. Government, its contractors, or grantees in Iraq; worked for U.S.-based media or nongovernmental organizations; or were a close relative of an eligible applicant.

9.      USCIS is responsible for security checks and adjudication of all refugee applications. The vetting of applicants includes biographic and biometric checks against an array of U.S. immigration, law enforcement, and intelligence databases, as well as mandatory, in-person applicant interviews. Often, USCIS's initial assessment of an application and applicant triggers additional investigation, security checks, and interviews.

3

10.     Until recently, USCIS maintained field offices located within U.S. embassies, including those in Amman and Moscow, to fulfill its responsibilities under the USRAP.  Within those field offices, USCIS, like many U.S. agencies operating abroad, commonly employed FSNs/LES.

11.     USCIS staff at international field offices were typically responsible for assisting with the processing and adjudication of refugee applications within their own geographic region. In 2018, USCIS began a phased effort to close its international field offices, consolidating USCIS international operations to offices within the United States.

## Worldwide Refugee Admissions Processing System (WRAPS)

*Records and Information in WRAPS and Limitations on Use*

12.     USRAP applications, or "cases," are tracked in WRAPS, which is managed by the Refugee Processing Center (RPC), a component of PRM located in the United States.  Each case is assigned a unique case number.  WRAPS connects the multiple U.S. Government agencies and other entities comprising the USRAP, including USCIS, and it serves as the information management system for the refugee application, adjudication, and resettlement process.  As such, WRAPS is a computer system used by and for government entities in furtherance of the administration of justice, national defense, and national security.  Access to WRAPS is limited to authorized personnel, which includes certain USCIS employees and previously included FSN/LES employees located at international field offices.

13.     For each USRAP case, WRAPS contains substantial information that is treated as confidential, including: personal identifying information and means of identification of applicants and their family members; applicants' employment history, prior military service, and their

4

accounts of persecution or fear of persecution; the results of security checks; questions and answers from USCIS interviews and proposed questions for future interviews; analyses of applicants' USRAP eligibility; and assessments of applicants' credibility and any potential threat they posed to U.S. public safety or national security. In addition to data entered into WRAPS, the system allows users to upload and download documents, such as refugee applications, employment verifications, and USCIS interview outlines.

14.    WRAPS is governed by "Rules of Behavior," which users are required to read, understand, and sign, and which makes clear that, among other things, WRAPS is "strictly for the purpose of refugee processing to support the [USRAP] only"; users "must never attempt to access information [they] are not authorized to access, which is not necessary for [them] to perform [their] job, or which is inappropriate or unnecessary to access"; and users "must never make a copy of sensitive information on a screen by taking a picture of it, capturing a screenshot, recording a video, or similar activities unless the image will remain on the WRAPS system and be stored in an appropriate location with access control." In addition, every time a WRAPS user logs into the system, they are required to acknowledge that they are accessing a U.S. Government database that is strictly for the purpose of refugee processing to support the USRAP.

*WRAPS I and WRAPS II*

15.    The current version of WRAPS, known as "WRAPS II," was introduced in 2013, and it replaced an earlier, original version, known as "WRAPS I." WRAPS I remained operational, however, and, at least until 2019, a user could access WRAPS I through a particular URL and could view or download the same information available in WRAPS II. If a user of WRAPS I needed to reset their password, however, the user could only do so within WRAPS II.

5

16.     In contrast to WRAPS I, WRAPS II includes an updated interface that displays the name of the user who is logged into the system at that time; the WRAPS I display did not contain that information.     Thus, a screenshot of the WRAPS II interface would capture the name of the user that is displayed on the screen, while a screenshot of WRAPS I would not.   In addition, WRAPS II contains certain audit features that allows for administrators to see when users have logged in or out of the system or reset their password.

17.     In June 2019, the RPC created a new audit feature that allows administrators to identify, retrospectively, which cases and files a user had accessed in WRAPS I or WRAPS II, and when the user had accessed them.   This feature is limited, however, in that it only provides information going back to on or about May 30, 2016.

*The Importance of Confidentiality of WRAPS Records and Information*

18.     In administering the USRAP, it is critically important that the State Department, DHS, and other agencies and employees involved in the USRAP ensure that sensitive U.S. Government records and information in WRAPS be kept confidential, non-public, and not available to unauthorized persons.   This confidentiality permits the agencies to administer the program fairly and lawfully, to protect the United States from threats to public safety and the national security, and, consistent with U.S. and international law, to assist foreign persons fleeing persecution, including by resettling them in the United States.

19.     The theft or receipt of sensitive records or information in WRAPS by unauthorized persons creates a number of risks.   For example, if an applicant is provided confidential records or information from WRAPS regarding their own case—such as security check results, interview questions, or internal assessments of an applicant's credibility—that applicant could use the

6

records or information to their advantage and potentially secure admission to the United States through the USRAP when that would not otherwise have occurred.   Such fraud increases the risk to public safety and national security of the United States.   Furthermore, because the number of refugee admissions to the United States are annually capped by the President in consultation with Congress, such an outcome would also likely preclude the admission of qualified refugee applicants who would otherwise be resettled in the United States.

## The Conspirators and Offense Conduct

20.    ABDULJABBAR, a citizen of Iraq, has lived in Jordan since approximately 2010. ABDULJABBAR previously applied for refugee resettlement in the United States, but his application was denied.   Records of ABDULJABBAR's electronic communications and other evidence show that ABDULJABBAR organized and led the conspiracy, and he relied on and paid SAD and KRASILOVA to steal WRAPS records and information so that ABDULJABBAR could assist applicants in gaining admission to the United States through fraudulent means.

21.    KRASILOVA, a Russian citizen living in Moscow, was an FSN/LES employed from August 2011 until February 2019 at the U.S. Embassy in Moscow, where she served as an Immigration Assistant at the USCIS field office.   There, she had access to WRAPS.   Throughout the conspiracy, KRASILOVA, referred to at times by co-conspirators as "the doctor," used her access to WRAPS to steal records and information that she later sent to SAD in exchange for money transmitted to her by SAD and by ABDULJABBAR.   KRASILOVA was directed in this criminal activity by SAD, who managed and supervised KRASILOVA's theft of WRAPS records and information.   SAD also directed KRASILOVA's attempts to recruit several additional co-conspirators.

7

22.     SAD and his co-conspirators' offense conduct was extensive and stretched several years.   Indeed, in attempting to recruit a potential co-conspirator in 2019, SAD indicated that he had worked to obtain records and information from WRAPS as part of the scheme for "maybe around eight years."   By stealing records and information from WRAPS, including sensitive U.S. Government information and personal applicant information such as their stories of persecution and their means of identification, SAD and KRASILOVA both abused positions of public trust in a manner that significantly facilitated the commission and concealment of their offenses.

23.     The value of the records and information stolen by the conspirators over several years was significant, as reflected by, among other evidence, the tens of thousands of U.S. dollars of payments passing from ABDULJABBAR and SAD in Jordan, through the United States, to KRASILOVA in Russia.

*SAD's Post-Employment Access to WRAPS, Aided by KRASILOVA*

24.     After SAD's USCIS employment ended in January 2016, he continued to access WRAPS remotely, and unlawfully, for several months.   KRASILOVA sought to assist him in this, even though she was aware that SAD was no longer employed by USCIS and that it was therefore unlawful for SAD to access to the system.

25.     Although records reflecting SAD's access to WRAPS prior to May 30, 2016 are not available, WRAPS audit records show that, between June 2016 and August 2016—that is, after SAD's employment with the U.S. Government had been terminated—SAD unlawfully accessed and obtained WRAPS records, including applicants' personal information, from at least 270 unique P-2 Iraq cases.   In those instances and throughout the conspiracy, SAD acted for his own financial gain—that is, payments from ABDULJABBAR—and in furtherance of the conspiracy

8

to steal records and information.   Moreover, the value of the records and information SAD stole from WRAPS without authorization exceeded $5,000.

26.     By the time SAD finally lost his own access to WRAPS in 2016, KRASILOVA had joined the conspiracy, having been recruited by SAD.

*Ongoing Theft of Government Records and Information*

27.     SAD and KRASILOVA were aware of the auditing limitations of WRAPS I versus WRAPS II, and, in an effort to conceal their unlawful conduct, purposely used WRAPS I. KRASILOVA explained this in a communication in early 2019, stating to an FSN/LES whom she and SAD sought to recruit to the conspiracy: "it's all you need. WRAPS access. But you will do cases in the old WRAPS. Not the new one. Because old WRAPS is not monitored. I mean, nobody will monitor, believe me . . . nobody will monitor. You just need to do the picture somehow."   In response to the potential recruit's request for clarification, KRASILOVA stated: "yes, WRAPS 1, WRAPS 1, only need WRAPS 1.   Anyway, you have two WRAPS, because if your password expires, you need WRAPS 2 to update your password.   So you'll have both . . . It's very good money, for nothing. You will start doing it, then, after your start doing it, first maybe you will be nervous, but then, when you are cautious of your environment, it's nothing, I mean, and you will realize, 'oh, it such easy money for nothing.'"

28.     Between May 2016 and late February 2019, based on WRAPS audit logs, KRASILOVA accessed at least 591 unique Iraq P-2 cases in WRAPS—many of which she accessed multiple times—even though she had no legitimate reason to access those cases as part of her work.   Moreover, between October 2018 and February 2019 alone, KRASILOVA sent more than 700 screenshots or documents from WRAPS cases from her official USCIS email

9

account to her personal Yahoo email.  KRASILOVA then transmitted the stolen records and information to SAD, who transmitted them to ABDULJABBAR.

29.     Financial records establish that, between June 2017 and February 2019, ABDULJABBAR sent KRASILOVA 19 payments through a U.S. financial services company, with a total value of approximately $20,000 U.S. dollars.   Between July 2017 and August 2017, SAD sent KRASILOVA payments through a U.S. financial services company, with a total value of approximately $2,500 U.S. dollars.   These payments, among others, were made in furtherance of the conspiracy.

*Requests and Thefts in Early 2019*

30.     Evidence of the conspirators' communications and conduct regarding certain WRAPS cases in early 2019 illustrate the nature and scope of the conspiracy and offenses, as well as the role of each defendant.   The transactions described below provide an illustrative example.

31.     On January 8, 2019, KRASILOVA and SAD exchanged messages about access to WRAPS.  SAD sent a message to KRASILOVA, "I bit [sic] you forgot the passwords," and KRASILOVA replied, "I did not! But I have it written down somewhere."   KRASILOVA then asked, "Hi, are you gonna send cases?" and "WRAPS works." SAD replied, "Tomorrow."

32.     On January 9, 2019, ABDULJABBAR sent a message to SAAD, providing a list of thirteen case numbers for SAD to send to KRASILOVA:   "[Case 1] [Case 2] [Case 3] [Case 4] [Case 5] [Case 6] [Case 7] [Case 8] [Case 9] [Case 10] [Case 11] [Case 12] [Case 13]: حبيبي للدكتوره."   The Arabic text translates to "My dear to the female doctor," a reference to KRASILOVA.

33.    On January 10, 2019, SAD sent a message to KRASILOVA containing the same list of case numbers:  "GM 🌷 🌷 [Case 1] [Case 2] [Case 3] [Case 4] [Case 5] [Case 6] [Case 7] [Case 8] [Case 9] [Case 10] [Case 11] [Case 12] [Case 13]."

34.    WRAPS audit logs show that, on the same day, KRASILOVA viewed each of the thirteen cases in WRAPS.   KRASILOVA then sent WRAPS screenshots and documents from her USCIS Government email to her Yahoo email—and, from there, to SAD's Yahoo email. KRASILOVA sent a message to SAD stating, "Hi, I sent you one portion. The other one is pending! Cell phone connection is awful here. 😕," and a subsequent message stating, "I sent the rest now."

35.    On January 11, 2019, SAD sent KRASILOVA messages stating, "Hello," "Received 7 cases," "The rest for tomorrow??," "Oh…just received them all," and "Thanks!!!!" KRASILOVA, referring to her WhatsApp messaging application, responded, "I sent you the rest now! It's crazy my what's app did not work! These fuckers block internet."  SAD responded "Aha," to which KRASILOVA replied "We can't use wifi in the embassy, that's the problem."

36.    On January 14, 2019, KRASILOVA sent a message to SAD, "Just check your email daily after 12 pm because my what's app does not work at the embassy 😕," referring again to WhatsApp, which the conspirators often used in the course of the conspiracy.

37.    Of the thirteen cases requested identified by ABDULJABBAR and SAD on January 9 and 10, 2019, KRASILOVA had viewed most of them several times before and after January 10, 2019, reflecting prior and subsequent requests for records and information about those cases from ABDULJABBAR and SAD, and demonstrating an ongoing effort by the conspirators to monitor these cases.  Specifically, email records show that, between October 10, 2018, and February 22,

11

2019, KRASILOVA sent screenshots or documents from her Government email to her Yahoo email several times, as follows:   Case 1 (11 times); Case 2 (15 times); Case 3 (9 times); Case 4 (1 time); Case 5 (3 times); Case 6 (5 times); Case 7 (15 times); Case 8 (3 times); Case 9 (10 times); Case 10 (7 times); Case 11 (6 times); Case 12 (5 times); Case 13 (1 time).

38.    The evidence demonstrates that ABDULJABBAR, SAD, and KRASILOVA intentionally and unlawfully sought to obtain records and information from WRAPS that were particularly sensitive.   For example, in a message to SAD on January 27, 2019, ABDULJABBAR listed approximately 12 Iraq P-2 cases with instructions to "withdraw the files, withdraw the story interview first, then the military files."   Likewise, in a February 20, 2019, email from SAD to KRASILOVA, SAD instructed KRASILOVA to obtain the "status" of three Iraq P-2 cases, and, as to three other such cases, stated, "need CIS interview," an reference to records or information regarding a USCIS interview.

39.    In 2019, in anticipation of the USCIS field office closures scheduled to begin with the USCIS Moscow field office in March 2019, SAD and KRASILOVA sought to recruit potential co-conspirators, including FSNs/LES in various U.S. embassies, who still had WRAPS access or who could obtain access through their employment.   As noted above, records of communications and other evidence demonstrate that SAD and KRASILOVA offered to pay such recruits in exchange for WRAPS records and information.

### Impact of the Offenses

40.    SAD and his co-conspirators' offenses significantly damaged the USRAP and the Iraq P-2 program.   As a result, the State Department, DHS, and other agencies will spend millions of dollars to investigate and mitigate the damage.   Among other tasks, this continuing effort

involves the identification of USRAP cases affected by the scheme, review of all cases to identify fraud and/or previously-unidentified security risks, and an array of subsequent remedial steps.

41.    As a condition of the parties' plea agreement, and solely for purposes of calculating a "loss amount" under section 2B1.1(b)(1) of the U.S. Sentencing Guidelines, SAD and the United States have agreed that the "pecuniary harm" that resulted from the conspirators' offenses and that was reasonably foreseeable to SAD *exceeded* $95,000 and that any calculation of "loss amount" for purposes of SAD's sentencing guidelines should be governed by the parties' stipulation.    The parties reserve the right to present information regarding the financial and other impacts of the offenses at sentencing.

13

## DEFENDANT'S ACKNOWLEDGMENT

The preceding statement is a summary made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me.   I make this statement knowingly and voluntarily, and I stipulate and agree that this Statement of Offense concerning my actions is true and accurate.   I have read every page of this Statement of Offense and have discussed it with my attorney, Jose German.   I am fully satisfied with the legal services provided to me in connection with this plea.   No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

Date: Jan 20, 21

Haitham Sad
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of Offense and have reviewed it fully with my client, Haitham Sad.   I concur in my client's desire to adopt and stipulate to this Statement of Offense as true and accurate.

Date: 1/20/2021

Jose German
Jose German
Attorney for Haitham Sad